UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
DEBORAH DEDEWO,

                              Plaintiff,                        Docket No.: 18-CV-9132 (AKH)

           -against-

CBS CORPORATION,

                              Defendant.
----------------------------------------------------------X

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

RICOTTA & MARKS, P.C.
*Attorneys for Plaintiff*
24-11 41st Avenue, Second Floor
Long Island City, New York 11101
(347) 464-8694

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES…………………………………………………………………..ii

PRELIMINARY STATEMENT…………………………………………………………….1

STATEMENT OF FACTS……..…………………………………………………….....1

LEGAL ARGUMENT……………………………………………………………….....8

SUMMARY JUDGMENT STANDARD……………………...…………….…………..…8

PLAINTIFF'S DISCRIMINATORY TERMINATION…..……………………………10

DISCRIMINIATORY INTENT/PRETEXT…..……..……………………………….....15

PLAINTIFF'S RETALIATION CLAIMS………………………………...…………...……14

CASUAL CONNECTION/PRETEXT ……………………………………….....................15

CONCLUSION………………………………………………………………………..18

# TABLE OF AUTHORITIES

**CASE LAW**                                                                 **Page(s)**

## Cases

Abdu Brinson v. Delta Airlines Inc., 239 F.2d 456 (2d Cir. 2001) .............................................. 12

American Mfrs. Mutual Ins. Co. v. American Broadcasting-Paramount Theatres, Inc., 388 F.2d 272 (2d Cir. 1967)......................................................................................................................... 9

Bennett v. Health Management Sys., Inc., 936 N.Y.S.2d 112 (2d Dept. 2011) ......................... 16

Bickerstaff v. Vassar Coll., 196 F. 3d 435 (2d Cir. 1999) ...................................................... 9

Borrero v. Collins Bldg. Services, Inc., 2002 WL 31415511 (S.D.N.Y Oct. 25, 2002).............. 15

Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548 (1986) ........................................... 9

Chambers v. TRM Copy Centers Corp.. 43 F.3d 29, 37 (2d Cir. 1994)..................................... 11

Cifra v. G.E. Co., 252 F.3d 205 (2d Cir. 2001) ..................................................................... 15

Cityspec, Inc. v. Smith, 617 F. Supp. 2d 161 (E.D.N.Y. 2009).................................................. 9

Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033 (2d Cir. 1993)............................................... 14

Cruz v. Coach Stores, Inc., 202 F.3d 560 (2d Cir. 2000). ..................................................... 13

DeMarco v. Holy Cross High School, 4 F.3d 166 (2d Cir. 1993) ............................................. 16

Dister v. Continental Group, Inc., 859 F.2d 1108 (2d Cir. 1988)............................................. 11

Eastway Constr. Corp. v. City of N.Y., 762 F.2d 243 (2d Cir. 1985.......................................... 9

EEOC v. Ethan Allen, Inc., 44 F.3d 116 (2d Cir. 1994)........................................................... 16

Egelston v. State Univ. College, 535 F.2d 752 (2d Cir. 1976) ................................................. 9

Gallo v. Prudential Residential Serv., 22 F.3d 1219 (2d Cir. 1994 .......................................... 9

Gordon v. New York City Bd. of Educ., 232 F.3d 111 (2d Cir. 2000) ....................................... 14

Howley v. Town of Stratford, 217 F.3d 141 (2d Cir. 2003).................................................... 10

Jaroslawicz v. Seedman, 528 F.2d 727 (2d Cir. 1975) ......................................................... 9

Khan v. Hip Centralized Lab. Servs., Inc., 2008 WL 4283348, *4 (S.D.N.Y. Sept. 17, 2008..... 15

Lander v. Hodel, 197 U.S. Dist. Lexis 11476 (D.C. Cir 1986) ................................................. 12

Lizardo v. Denny's, Inc., 270 F.3d 94 (2d Cir. 2001) ............................................................. 12

Mandel v.  County of Suffolk, 316 F.3d 368 (2d Cir. 2003) .................................................. 12

Maresco v. Evans Chemetics, 964 F.2d 106 (2d Cir. 1992) .................................................... 12

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) .................................................. 10, 12

Meiri v. Dacon, 759 F.2d 989 (2d Cir. 1985) ...................................................................... 9

Mfrs. Mutual Ins. Co. v. American Broadcasting-Paramount Theatres, Inc., 388 F.2d 272 (2d Cir. 1967) ...................................................................................................................... 9

Mihalik v. Credit Agricole Cheuvreux North America, Inc., 715 F.3d 102 (2d Cir. 2013) ......... 10

Montana v. First Fed. Sav. & Loan Ass'n., 869 F.2d 100 (2d Cir. 1989 .................................... 9

Owen v. Thermatool Corporation, 155 F.3d 137 (2d Cir. 1998) ............................................. 11

Quinn v. Green Tree Credit Corp., 159 F.3d 759 (2d Cir. 1998) ............................................. 15

Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000)....................................... 10, 1215

Renz v.  Grey Advertising, Inc., 135 F.3d 217 (2d Cir.1997) ................................................. 11

Richardson v. New York State Dept. of Corr. Serv., 180 F.3d 426 (2d Cir. 1999)...................... 15

Roge v. NYP Holdings, Inc., 257 F.3d 164 (2d Cir. 2001) ...................................................... 10

Schoenbaum v. Firstbrook, 268 F. Supp. 385 (S.D.N.Y. 1967) ............................................... 10

Shumway v. United Parcel Service, Inc., 118 F.3d 60 (2d Cir. 1997)........................................ 12

Sletten v. LiquidHub, Inc., 2014 U.S. Dist. LEXIS 94697 (S.D.N.Y. July 10, 2014) ................ 15

St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993)................................................ 16
Stratton v. Dept. for the Aging for the City of New York, 132 F.3d 869 (2d Cir.1997)............. 11
Waters v. Churchill, 511 U.S. 661, 114 S. Ct. 1878 (1994) ........................................ 9
Zuk v. Onondaga Cty., 471 F. App'x 70 (2d Cir. 2012) ............................................ 12

**Statutes**

42 U.S.C. § 1981 ............................................................................... 1
N.Y. Exec. L. §290.............................................................................. 1
N.Y.C. Admin. Code §8-101, et seq ............................................................. 1
Title VII of the Civil Rights Act of 1964 ..................................................... 1

## PRELIMINARY STATEMENT

Plaintiff, Deborah Dedewo ("Dedewo"), a former employee of CBS Corporation ("CBS"), filed a complaint against CBS, on October 4, 2018, alleging that she was subjected to unlawful discrimination based upon her gender and race, as well as retaliation during the course of her employment, in violation of the Civil Rights Act of 1866 as amended, 42 U.S.C. § 1981, the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. §290, et seq., and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §8-101, et seq.[1]   Discovery has concluded and Defendant moves for Summary Judgment in its entirety. Plaintiff submits this memorandum of law in opposition to Defendant's Motion for Summary Judgment.

As demonstrated by Plaintiff's Rule 56.1 Counterstatement, the Affidavit of Deborah Dedewo, and the Exhibits attached thereto, as well as the arguments set forth below, Defendant's motion fails to meet the standard necessary to warrant a granting of summary judgment as genuine issues of fact exist upon which a reasonable juror finding that Defendant engaged in unlawful discrimination and retaliation.  Accordingly, Defendant's motion for summary judgment should be denied in its entirety.

## STATEMENT OF FACTS

Dedewo is a black female.  (Dedewo 38).[2]   In July 2012, Dedewo began working for CBS as a freelancer for CBS Sports Network.  (Dedewo 36).  Dedewo worked in the media asset management group ("MAM").  (Dedewo 36).  Less than a year into working for Defendant, Dedewo earned a raise as a byproduct of her job performance.  (Dedewo 37).  Approximately, one month after Dedewo began working for Defendant, Edward Coleman ("Coleman") became her

---

[1] Plaintiff withdraws her claims relating to a discriminatory failure to promote, but still discusses facts relating to this claim, as they are relevant background for her retaliation claim.

[2] Hereinafter, citations to deposition testimony will be identified as follows: ([Last name of deponent][page number]). Plaintiff's deposition transcript is attached to the affidavit of Deborah Dedewo as Exhibit "1."

supervisor.  (Dedewo 38).  Dedewo applied for a staff role with CBS Sports Network in 2014.  (Dedewo 58).  As a result of Dedewo's work performance, in August 2014, CBS converted Dedewo to a staff member, with the title, Media Services Coordinator with CBS Sports Network.  (Dedewo 55-57, 61).  Coleman wanted to keep Dedewo in MAM.  (Dedewo 70).  In early 2015, Dedewo received a positive overall year end evaluation for the 2014 year.  (Dedewo 74).  The evaluation was based upon Coleman's input and input he received from other employees.  (Dedewo 76).  As a result of this evaluation, CBS gave Dedewo another raise.  (Dedewo 74).

Shortly after Dedewo started at Defendant, she informed Coleman that she had an interest in editing.  (Dedewo 89).  Coleman suggested that Dedewo train with Senior Editor Jose Pelaez, but she was already working with him.  (Dedewo 94-95).  In November 2013, Coleman assigned Dedewo's white, male co-worker, Timothy Franklin ("Franklin") to sit in on edits and to edit for a studio show.  (Def. Ex. PP).  Dedewo complained to Coleman that she was being overlooked for this editing opportunity.  (Dedewo 248; Def. Ex. PP).  As a result of Franklin getting this editing opportunity, he was able to join the union the following year and became the main person for that type of editing, which opened up other opportunities for him.  (Dedewo 250).  While Coleman responded that he was waiting for Dedewo to tell him that she was confident enough using the Adobe editing session, Dedewo had previously informed him that she was ready to begin editing.  (Def. Ex. PP).  Following being overlooked for this editing opportunity, Dedewo redirected her goals away from editing.  (Dedewo 90).  Dedewo advised Coleman of her change in focus.  (Dedewo Aff.  ¶ 3).

In or around September 2013, Nora McGoldrick ("McGoldrick"), was promoted to the position of Supervisor-Post-Production.  (Def. Ex. SS).  Dedewo did not receive an email about this opening, and as such was unable to apply. (Dedewo Aff. ¶ 4).  Daniel Carragher ("Carragher"),

a coworker, told Dedewo that Coleman did not believe she should apply for the position that was given to Nora McGoldrick.  (Dedewo 111-112, 116, 140).

Around November 2013, Dedewo complained to human resources about the lack of these opportunities.  (Dedewo 278).  Shortly thereafter, Coleman told Dedewo that he had to go to him before bringing complaints to Human Resources.  (Dedewo 278-79).

In June 2013, McGoldrick asked Dedewo about editing sessions with Defendant's features group.  (Dedewo 91-92).  Dedewo turned down this offer because although it was an increase in work, it did not come with a pay increase.  (Dedewo 92; Dedewo Aff. ¶ 5).  Moreover, Dedewo had previously advised Defendant that she was seeking opportunities that did not involve editing.  (Dedewo Aff. ¶ 5).

In April 2014, Christopher Cruz ("Cruz"), was promoted from Digital Achieves Manager to Manager, Media Services.  (Def. Ex. F).  The application for this position was not posted and, as such, Dedewo was not afforded an opportunity to apply for it.  (Dedewo Aff. ¶ 6).

In July 2014, Coleman, on short notice, asked Dedewo if she wanted to fill in for a co-worker and edit for a morning radio show who's shift started at 4 a.m.  (Dedewo 92-93).  Dedewo declined this opportunity because, among other reasons Defendant was not offering to pay Dedewo the editor's pay rate for this assignment.  (Dedewo Aff. ¶ 7).  Moreover, at that time, Dedewo had already explained that she was not interested in editing, and the editing involved in this assignment was minor.  (Dedewo 98; Dedewo Aff. ¶ 7).  As a result, Defendant's staff editors and freelance editors all declined this fill in assignment, as well.  (Dedewo Aff. ¶ 8).

In September 2014, Coleman assigned Robert Collins ("Collins"), white male freelancer, to an administrative assignment.  (Dedewo Aff ¶ 9).  This administrative position involved working with operations, which is what Dedewo had regularly asked Coleman to be involved in.  (Dedewo Aff. ¶ 10).  Dedewo complained to Coleman, Cruz, and Marlene Baez in Human Resources about

not being given an opportunity to apply for this position.  (Dedewo Aff ¶ 11).  Although Coleman

claims that this assignment lasted "only a few days," Collins was still performing these duties until

at least August 2015.  (Coleman Decl. ¶ 19; Ex. 2).

One of Dedewo's goals in 2015 was to develop a better understanding of Dalet, a media

asset management tool.  (Dedewo 81; Coleman Decl. ¶ 35).  While Defendant designated Dedewo

the "point person" between engineering, archives, and Dalet, this just reflected the work that

Dedewo was already performing.  (Dedewo 81-82).  Dedewo explained to Coleman that she

wanted to continue working with Dalet.  (Dedewo 84).  Dedewo also expressed that she wanted to

move into operations with Defendant. (Dedewo 86).

Coleman discussed with Dedewo the possibility of her working with Defendant's Features

Department.  (Dedewo 101).  However, it was just one discussion and Coleman did not say that a

position in the Features Department was actually available to her.  (Dedewo 103).  This possible

new position would involve doing a lot of the same work she was already performing, as opposed

to a new opportunity.  (Dedewo 104).  This position, if it became available, would not come with

a change in title or increase in pay.  (Dedewo 103).  Dedewo told Coleman that she was looking

for a position in operations or as a supervisor.  (Dedewo 103).  Dedewo also explained that she

would work on special projects, such as features, but did not want to do that exclusively, as she

was asking to advance in operations, not editing.  (Dedewo Aff. ¶ 12).  If Dedewo had taken this

not yet created position, she would be excluded from the changes upcoming for Defendant which

eventually resulted in promotions for Cruz, McGoldrick and Collins.  (Dedewo Aff. ¶ 13).

Dedewo spoke to Coleman and Christopher Cruz ("Cruz"), about a supervisory position

for MAM, Supervisor Post-Production and Media Services.  (Dedewo 109-10; 121, 324; Coleman

Decl. ¶ 9).  However, Defendant never offered Dedewo this position, claiming that it could not be

created due to budget cuts.  (Dedewo 252-53).

4

In August 2015, Defendant arranged for Wetoskey to attend EVS training.  (Ex. 3).
Coleman excluded Dedewo from training for EVS, which is needed for events like the Super Bowl.
(Dedewo 278).  EVS is a broadcast digital video production system that is used at major sporting
events.  (Dedewo Aff. ¶ 14).  Dedewo was the only MAM staff member who did not receive EVS
training, and Defendant never offered her this training.  (Dedewo Aff. ¶ 15).

On August 28, 2015, Dedewo met with Berglund.  (Def. Ex. D).  During this meeting,
Dedewo again complained about not being afforded the opportunity to apply for the positions that
Cruz and McGoldrick received.  (Def. Ex. D).  Dedewo also complained of gender discrimination,
stating that Collins, despite being a freelancer with less seniority than Dedewo, was given
opportunities that she was denied, due to the "boy's club," referring to the administrative position.
(Def. Ex. D).

In preparing for the upcoming 2016 Super Bowl, Coleman elected to take Collins and
Wetoskey from MAM to go to the Super Bowl, and refused to take Dedewo, despite the fact that
Collins was not staff at that point and Dedewo was.  (Dedewo Aff. ¶ 16).

In September 2015, Dedewo's brother would be competing in an international track meet
in Europe, at which he would try to qualify for the Olympics.  (Dedewo Aff. ¶ 27).  Dedewo,
intending to be there to watch her brother compete, began making plans in the summer to travel to
Europe.  (Dedewo 123, 131, 134).  During the summer, Dedewo spoke to Coleman about going to
Europe and watching her brother compete, and he did not raise any objection.  (Dedewo 135-36).

Dedewo had one vacation day available at that point. (Dedewo 132).  As such, Dedewo
asked about submitting for time off without any accruals.  (Dedewo 132; Def. Ex. T).  Dedewo
submitted a request for unpaid time off to take this trip, but Coleman denied her request.  (Dedewo
127; Def. Ex. S).  After a conversation with Bryn Berglund ("Berglund"), Human Resources, in
which Berglund also informed Dedewo that her leave request was denied, Dedewo informed her

that she understood and was making other arrangements.  (Dedewo 168; Def. Ex. X).  As a result of this denial, Dedewo worked to have her shifts switched and took a shorter trip to Europe than she originally planned. (Dedewo 128; 169).  Dedewo was able to switch shifts with co-workers for all but one (1) day of her shortened trip.  (Dedewo 170).  Switching shifts was common in MAM. (Dedewo Aff.  ¶ 26).  On that day, she called out sick, which she was.  (Dedewo 170-72).  Dedewo was suffering from myomas, and if she had been in New York, she would not have been able to work that day.  (Dedewo Aff.  ¶ 17).  McGoldrick approved all of the shift changes that Dedewo made.  (Ex. 5)**.**  Dedewo did not keep her trip a secret, as she told all of her co-workers that she was going.  (Dedewo Aff.  ¶ 18).

On September 22, 2015, Dedewo was returning from her trip.  (Dedewo 181).  As such, she had shifted her schedule that day to work the evening shift, which started at 6 p.m.  (Dedewo 181).  That evening, Dedewo was more than two hours late to work.  (Dedewo 181-82).  Dedewo's flight arrived in New York sometime before 5.  (Dedewo 187).  McGoldrick texted Dedewo after 6 p.m. asking where she was.  (Def. Ex. BB).  Coleman followed up with a text message as well.  (Def. Ex. BB).  As Dedewo was returning from her trip, she did not have good cell phone service.  (Dedewo 182).   As soon as she received the text messages from Defendant, she responded.  (Dedewo 182).  Dedewo texted back explaining that she was "[u]nfortunately still in transit," as she was in transit coming back from the airport to work.  (Dedewo 183, 186; Def. Ex. BB).  The next day or so, Coleman asked Dedewo about her being late.  (Dedewo 191).  Dedewo said that she was in transit with her brother.  (Dedewo 191).  Coleman responded that she should not let it happen again.  (Dedewo 191).

On September 28, 2015, Coleman and Berglund presented Dedewo with an attendance warning.  (Dedewo 196; Def. Ex. GG). The warning also claimed that Dedewo was dishonest with Coleman, which she was not.  (Dedewo 186; Def. GG).  During this meeting, Dedewo explained

that other employees came in exceedingly late. (Dedewo 197). Dedewo did not feel comfortable with the conversation and said she was going to excuse herself, which she did. (Dedewo 197-98). Dedewo complained through CBS' Openline complaint forum regarding this attendance warning, as it was incorrect. (Dedewo 199; Def. Ex II). This warning falsely stated that Dedewo told Coleman that he was "hanging out with" her brother and was 'just late.' (Dedewo 205). In her complaint, Dedewo said she wanted "to file a complaint which involves a lack of Equal Opportunity, Discrimination and Harassment." (Def. Exh. II). Ross Wetoskey ("Wetoskey") (male, white) and Robert Collins (male, white) were both at least two and a half (2 ½) hours late for work on at least one occasion. (Dedewo 206). On September 7, 2014, Wetoskey was at least two and a half (2 ½) hours late for work. (Dedewo Aff. ¶ 19). Coleman was aware that Wetoskey was this late because he asked her to come in and cover Wetoskey's shift. (Dedewo Aff. ¶ 19). Wetoskey was not disciplined for this lateness. (Dedewo Aff. ¶ 20). On June 11, 2014, Collins left work two (2) hours early to watch a hockey game. (Dedewo Aff. ¶ 21). On August 18, 2014, Collins called in sick his first day back from vacation. (Dedewo Aff. ¶ 22). On August 17, 2015, Collins called out sick his first day back from vacation. (Dedewo Aff. ¶ 22). They were not written up or issued a verbal warning for being late. (Dedewo 208).

In addition to complaining to Openline, Dedewo complained about this warning to Josie Thomas ("Thomas"), Defendant's Executive Vice President and Chief Diversity Officer, and Ray Gutierrez ("Gutierrez"), Senior Human Resources Executive. (Dedewo 210). In response to Dedewo's Openline complaint, she was contacted by Sonia Cheney ("Cheney"). Deputy Compliance Officer. (Dedewo 225). During their first conversation, Dedewo explained that she was working and it was not a good time to speak, so they scheduled a time to speak the next day. (Dedewo 229-30). During this second conversation, Cheney asked Dedewo if she had taken a trip to Europe. (Dedewo 230-31). Dedewo was confused by the way Cheney worded her question,

and initially said that she had not taken a trip but changed her response and explained that she had taken a shorter trip than originally planned. (Dedewo 231). As Dedewo felt that the conversation was not focused on Dedewo's Openline complaint, she asked Cheney if the conversation was confidential; she did not ask Cheney not to tell Coleman about her trip, nor did she tell Cheney that no one knew about the trip. (Dedewo 232-33; 235). Dedewo explained that in order to take a shortened trip she switched her schedule as much as possible and called in sick on that one occasion. (Dedewo 235). Defendant did not investigate Dedewo's complaints according to company policy. (Dedewo 243).

Rather than investigate her complaints, upon receiving her complaints Defendant began the process the led to her termination on October 1, 2015. (Berglund Aff. ¶ 4-8; Coleman Decl. ¶ 30-32). Despite this, the next day, Coleman emailed Dedewo asking if she wanted to work on the Final Four. (Def. Ex. Q). Defendant terminated Dedewo on October 5, 2015. (Dedewo 237). Coleman told Dedewo that Berglund wanted to meet with her, and when Dedewo arrived Berglund was there was Gutierrez. (Dedewo 238). Berglund told Dedewo that she was being terminated for insubordination and dishonesty, which was the same as the warning she originally received. (Dedewo 239; Def. GG). When Dedewo asked if she could respond, Gutierrez told her she was not. (Dedewo 239). Defendant claimed, at least in part, that the reason for Dedewo's termination was the false allegation that she asked Cheney not to tell Coleman that she had taken the trip to Europe. (Dedewo 232-33; 235; 240-41)

## **LEGAL ARGUMENT**

### I.    **SUMMARY JUDGMENT STANDARD**

The granting of a summary judgment motion is a drastic remedy which must be used "sparingly," because it has *res judicata* effect and deprives the litigant of his/her day in court and

his/her opportunity to cross-examine the movant and movant's witnesses. *Gallo v. Prudential Residential Serv.*, 22 F.3d 1219 (2d Cir. 1994); *Egelston v. State Univ. College*, 535 F.2d 752 (2d Cir. 1976); *Eastway Constr. Corp. v. City of N.Y.*, 762 F.2d 243 (2d Cir. 1985), *cert. denied*, 484 U.S. 918 (1987).   As a result of the drastic nature of summary judgment, the judicial standard applied in granting the motion is narrow as the motion must be denied if, any genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548 (1986).   Additionally, the court must carefully scrutinize the proofs submitted in the light most favorable to the non-movant and accord the non-movant the full benefits of all favorable inferences that may be drawn from the evidence. *Waters v. Churchill*, 511 U.S. 661, 114 S. Ct. 1878 (1994).   If there is any doubt as to the existence of a triable issue of fact or if a material issue of fact is arguable, summary judgment must be denied.   *Jaroslawicz v. Seedman*, 528 F.2d 727, 731 (2d Cir. 1975). Additionally, all inferences must be drawn in favor of the non-moving party.   *Cityspec, Inc. v. Smith*, 617 F. Supp. 2d 161, 168 (E.D.N.Y. 2009).

In employment discrimination cases where a defendant's intent is at issue, the Second Circuit has held that the district court "must be cautious about granting summary judgment to an employer."   *Montana v. First Fed. Sav. & Loan Ass'n.*, 869 F.2d 100 (2d Cir. 1989); *see also Bickerstaff v. Vassar Coll.*, 196 F. 3d 435, 448 (2d Cir. 1999) ("as discrimination will seldom manifest itself overtly, courts must be alert to the fact that [e]mployers are rarely so cooperative as to include a notation in the personnel file that the firing is for reasons expressly forbidden by law"); *Meiri v. Dacon*, 759 F.2d 989 (2d Cir. 1985), *cert. denied*, 474 U.S. 829 (1985). Moreover, fact issues, including those involving witness credibility and inconsistencies in the opposing parties' summary judgment papers and proofs, can only be resolved at trial.   *American Mfrs. Mutual Ins. Co. v. American Broadcasting-Paramount Theatres, Inc.*, 388 F.2d 272 (2d Cir. 1967). The District Court's role on a summary judgment motion is limited to issue finding only, not issue

resolution. *Gallo*, 22 F.3d at 1219; *Jaroslawicz*, 528 F.2d at 727.  Thus, if the movant's papers depend heavily upon the credibility of witnesses, the motion must be denied. *American Mfrs. Mutual Ins. Co.*, 388 F.2d at 284-85; *Schoenbaum v. Firstbrook*, 268 F. Supp. 385 (S.D.N.Y. 1967), *aff'd in part, rev'd in part on other grounds*, 405 F.2d 215 (2d Cir. 1968), *cert. denied*, 395 U.S. 906 (1969).

## II.   **PLAINTIFF'S DISCRIMINATORY TERMINATION**

In an employment discrimination case, courts utilize the burden-shifting scheme set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-804 (1973). In order to establish a *prima facie* case of discrimination, an employee must show: (1) that she belonged to a protected class; (2) that she was qualified for the position; (3) that she was subject to an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001). Under the *McDonnell Douglas* framework, while a plaintiff must first establish each element of her *prima facie* case, this burden has been deemed as "minimal." *Howley v. Town of Stratford*, 217 F.3d 141, 150 (2d Cir. 2003).  Under the NYCHRL claim, as Plaintiffs need only show that she has been treated "less well" than other employees due to discrimination.  *Mihalik v. Credit Agricole Cheuvreux North America, Inc.*, 715 F.3d 102, 110 (2d Cir. 2013).

Once plaintiff establishes a *prima facie* case, then the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action." *Id.*  A Plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's justification is false, may permit the trier of fact to conclude that the employer discriminated. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000).  Defendant argues that

Dedewo cannot establish an inference of discrimination, and that Defendant had a legitimate business reason for its termination of Dedewo.  These arguments will be addressed below.

## A.       Discriminatory Intent/Pretext

The fourth element of Plaintiff's *prima facie* case is the demonstration of an inference of discrimination. After *a prima facie* case is demonstrated, the defendant must advance a legitimate business reason for their actions and the plaintiff then presents evidence of pretext. Because the facts which support an inference of discrimination overlap with the facts used to demonstrate a pretext, Plaintiff discusses both factors in this section.

The ultimate question in a discrimination case is whether Plaintiff has alleged evidence from which it can reasonably be inferred that Plaintiff's status in a protected class "played a motivating role in, or contributed to, the employer's decision" to take a particular employment action. *Renz v.  Grey Advertising, Inc.*, 135 F.3d 217, 222 (2d Cir.1997); *Stratton v. Dept. for the Aging for the City of New York*, 132 F.3d 869, 879(2d Cir.1997).  Most notably, Plaintiff's status in a protected class need not be the only factor considered in the employment actions. *Owen v. Thermatool Corporation*, 155 F.3d 137, 139 (2d Cir. 1998) (holding that the most important factor for a discrimination jury charge to convey is the idea that: (1) the impermissible factor must have played a role in the employer's decision, and (2) the factor need not have been the sole consideration motivating the employer's decision).

Direct evidence proving whether Plaintiff's protected classes is a motivating factor in an employment action is often difficult to find because those who discriminate deliberately try to conceal their discriminatory intent. *Chambers v. TRM Copy Centers Corp.*. 43 F.3d 29, 37 (2d Cir. 1994).  Moreover, discriminatory intent will rarely be demonstrated by "smoking gun" proof.  Rather, in most discrimination cases direct evidence of the employer's motivation is unavailable.   *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1112 (2d Cir. 1988).

11

Accordingly, a plaintiff need not allege direct evidence to demonstrate that his status in a protected class was a motivating factor in adverse employment actions. *See McDonnell Douglas*, 411 U.S. at 802; *Maresco v. Evans Chemetics*, 964 F.2d 106, 110 (2d Cir. 1992).  There are many different ways to prove a discriminatory motive. The most common way of proving discrimination is to show that preferential treatment was given to employees outside the protected class. *Abdu Brinson v. Delta Airlines Inc.*, 239 F.2d 456, 468 (2d Cir. 2001); *Mandel v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003). A "plaintiff must show she was 'similarly situated in all material respects' to the individuals with whom she seeks to compare herself." *Shumway v. United Parcel Service, Inc.*, 118 F.3d 60, 64 (2d Cir. 1997). "In this analysis, there must be an "objectively identifiable basis for comparability" between the plaintiff and the comparator employee, which includes an assessment of "whether the conduct for which the employer imposed discipline was of comparable seriousness," *Zuk v. Onondaga Cty.*, 471 F. App'x 70, 71 (2d Cir. 2012).  "When plaintiffs seek to draw inferences of discrimination by showing that they were 'similarly situated in all material respects' to the individuals to whom they compare themselves, their circumstances need not be identical, but there should be a reasonably close resemblance of facts and circumstances." *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 101 (2d Cir. 2001).  "What is key is that they be similar in significant respects." *Id.*

Additionally, evidence of a discriminatory motive can be established by demonstrating that the reasons given for a particular action were pretextual. *Reeves v. Sanderson Plumbing Products. Inc.*, 530 U.S. 133, 147 (2000). Responding to an employment situation in a manner that deviates from the ordinary policy of the employer may also evidence an unlawful motive. *Lander v. Hodel*, 197 U.S. Dist. Lexis 11476 (D.C. Cir 1986). These are all factors, among others, that may be considered in determining whether Plaintiff's national origin, was a

motivating factor in the adverse decisions. The inquiry is not limited to the aforementioned factors. Rather, Courts must consider the working environment as a whole. *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000).

Here, Dedewo has established that she was treated differently that others who were similarly situated in all material respects. First, Dedewo did not keep her trip secret. She spoke to Coleman about it before she put in for the dates to be approved for unpaid time off. After her request for unpaid time off was denied, she explained that she was making other arrangements. Dedewo switched her shifts for all days but one (1), and all of her shift changes, which were a common practice, were approved. On the day that Dedewo called in sick, she really was sick with myomas. Dedewo does not dispute that she was late on September 22. When she texted McGoldrick and Coleman that she was "in transit" she was in transit. It may have been from the airport as opposed to her apartment, but she was in transit on her way to work.

Dedewo was terminated for this, while her white, male co-workers were not disciplined for similar issues. Wetoskey and Collins were both at least two and a half (2 ½) hours late for work on at least one occasion. On September 7, 2014, Wetoskey was at least two and a half (2 ½) hours late. Coleman knew Wetoskey was this late because he asked Dedewo to come to work and cover his shift. Wetoskey was not disciplined for this lateness. On June 11, 2014, Collins left work two (2) hours early to watch a hockey game. On August 18, 2014, Collins called in sick his first day back from vacation. Again, on August 17, 2015, Collins called out sick his first day back from vacation. Neither Wetoskey nor Collins were not written up or issued a verbal warning for being late. As such, Dedewo has established that she was treated differently than her white, male co-workers who were not punished for similar infractions.

Similarly, Defendant's proffered legitimate business reasons, that Dedewo went on an unauthorized trip, lied about it, and was late for her shift, is pretext for discrimination. While

Defendant did not approve her unpaid time off for her trip, it did approve the shift switches she made for all but 1 of the day of her trip.  When she called out of work sick, she was actually sick. When she texted that she was "in transit," she was in transit.  She did not ask Cheney not to tell Coleman that she went on a trip.  She believed that Coleman knew she was going to Europe because she first discussed it with him, and then her shift switches were approved.  A reasonable jury could find that Defendant knew about the trip given that Dedewo discussed it with Coleman, said she would make other arrangements when her unpaid leave was denied, and then Defendant approved her shift changes for all the majority of the same dates that she previously said she was going to Europe.  These facts, combined with Defendant's failure to punish white, male co-workers who were exceedingly late and who called in sick the day after their vacation was supposed to end, evidence that Defendant's proffered legitimate business reason was mere pretext for discrimination sufficient to defeat a motion for summary judgment.

### III.      **PLAINTIFF'S RETALIATION CLAIMS**

While Defendant does not address this in its motion, Plaintiff, in her complaint, set forth a claim for retaliation with respect to her termination as well.  (Ex. F ¶ 6).  [T]o establish a *prima facie* case of retaliation under Title VII, as well as the NYSHRL and NYCHRL, an employee must show that: "(1) he was engaged in an activity protected under Title VII; (2) the employer was aware of plaintiff's participation in the protected activity; (3) the employer took adverse action against plaintiff; and (4) a causal connection existed between the plaintiff's protected activity and the adverse action taken by the employer." *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000) (quoting *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir. 1993). Under the City Human Rights Law, a plaintiff does not need to prove an adverse action, only that "something happened that would be reasonably likely to deter a person from engaging in protected

activity." *Sletten v. LiquidHub, Inc.*, 2014 U.S. Dist. LEXIS 94697, 13 (S.D.N.Y. July 10, 2014).

Additionally, when a defendant proffers an alleged legitimate business reason for the adverse

actions it took against the plaintiff, it is incumbent upon plaintiff to then demonstrate that this

reason is pretextual in nature. *See Richardson*, 180 F.3d at 443. Here, Defendant terminated

Plaintiff a week after she made a complaint of discrimination.

### A.   Causal Connection /Pretext

A plaintiff may establish the causal connection in one of several ways. *Borrero v. Collins

Bldg. Services, Inc.*, No. 01 Civ. 6885 (AGS), 2002 WL 31415511, at *15 (S.D.N.Y Oct. 25, 2002).

First, plaintiff may present "evidence of retaliatory animus directed against the plaintiff [to]

establish the causal connection directly." *Id.* (citations and internal quotation marks omitted). It

is well established that the "causal connection needed for a proof of a retaliation claim can be

established indirectly by showing that the protected activity was closely followed in time by the

adverse action." *See Cifra v. G.E. Co.*, 252 F.3d 205, 217 (2d Cir. 2001) (internal quotations

omitted); *see also Richardson v. New York State Dept. of Corr. Serv.*, 180 F.3d 426, 444 (2d Cir.

1999) (holding one month between protected activity and adverse action establishes causal

connection); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998) (two months

between protected activity and adverse employment action establishes causal connection); *Khan

v. Hip Centralized Lab. Servs., Inc.*, No. 03 Civ. 2411 (DGT), 2008 WL 4283348, *4 (S.D.N.Y.

Sept. 17, 2008 (temporal proximity of six weeks "is sufficiently close to allow the jury to find that

the [adverse employment action] was retaliatory").

Additionally, the falsity of an employer's proffered reason is sufficient evidence for a

reasonable juror to infer that the employer's proffered reason is pretext for intentional retaliation.

*See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) ("it is permissible for

the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's

explanation"); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993) (rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination").  With respect to the NYCHRL retaliation, the falsity of an employer's proffered reason compels the denial of summary judgment.  *See Bennett v. Health Management Sys., Inc.*, 936 N.Y.S.2d 112, 123 (2d Dept. 2011).  As the court held in *Bennett*:

> Once there is some evidence that at least one of the reasons proffered by defendant is false, misleading, or incomplete, a host of determinations properly made only by a jury come into play, such as whether a false explanation constitutes evidence of consciousness of guilt, an attempt to coverup the alleged discriminatory conduct, or an improper discriminatory motive co-existing with other legitimate reasons. These will be jury questions except in the most extreme and unusual circumstances. Proceeding in this way reaffirms the principle that trial courts must be especially chary in handing out summary judgment in anti-discrimination cases, because in such cases the employer's intent is ordinarily at issue.

*Id.* (internal citations and quotations omitted).  While this case does not have precedential impact on the Title VII and NYSDHR claims, it is persuasive and it is logical that if a juror a believes that one of the reasons for Plaintiff's termination was fabricated and/or exaggerated, a jury could use that as a basis to find pretext.

Finally, where an employer has offered varied and conflicting explanations for the adverse employment action, there is a material issue of fact which requires a jury determination.  *See*, *e.g.*, *EEOC v. Ethan Allen, Inc.*, 44 F.3d 116 (2d Cir. 1994) (reasonable juror could infer that the explanations given by defendant at trial were pretextual, developed over time to counter evidence suggesting discrimination); *DeMarco v. Holy Cross High School*, 4 F.3d 166, 171 (2d Cir. 1993) (pretext inquiry takes into consideration "whether the putative non-discriminatory purpose was stated only after the allegation of discrimination).

Here, Plaintiff can establish a causal connection between her complaints of discrimination and her termination through the timing and sequence of events, as well as through the pretextual nature of the actions taken against Plaintiff.  The same day that Defendant issued her a warning

letter, Dedewo filed a complaint with their Openline service.  In that complaint, she stated that she wanted "to file a complaint which involves a lack of Equal Opportunity, Discrimination and Harassment."  A week after she filed her complaint, she was terminated for the same alleged incident that Defendant previously received a warning letter.  The timing of her termination, coupled with the fact that Defendant had already disciplined her for the same incident, evidence that her termination was retaliation for her complaint of discrimination.

Moreover, Defendant's proposed legitimate business reasons for terminated Dedewo are pretextual.  As detailed above, Dedewo's white, male counterparts showed up exceedingly late, left exceedingly early and/or called out the day after their vacation ended, without discipline. Despite Defendant's claims to the contrary this was not a "secret trip."  Dedewo asked for the days off, and when Coleman denied that, she said she was making other arrangements.  She then switched shifts with co-workers for nearly every single day of her trip, which Defendant approved. Dedewo told all of her co-workers about her trip at the office and believes it was common knowledge.  Defendant already issued Dedewo a warning letter, both regarding her attendance and alleged dishonesty.  It was only after Dedewo filed the complaint on Open Line regarding "a lack of Equal Opportunity, Discrimination and Harassment," that Defendant changed Dedewo's warning into a termination.  As a result, a reasonable juror could find Defendant's alleged legitimate business reasons for their actions to be nothing more than pretext for discrimination and retaliation.

## **CONCLUSION**

For the reasons discussed herein, defendant's motion for summary judgment should be

denied in its entirety.

Dated: Long Island City, New York
February 11, 2022

Respectfully submitted,

RICOTTA & MARKS, P.C.
*Attorneys for Plaintiff*
24-11 41st Avenue, Second Floor
Long Island City, New York 11101

By:_____/s_____
Matthew I. Marks

18