UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X
                                       :

DEBORAH DEDEWO,                  :

                                        :      **ORDER AND OPINION**

                          Plaintiff,  :      **GRANTING MOTION FOR**

           -against-             :      **SUMMARY JUDGMENT**

                                           :

CBS CORPORATION,           :      18 Civ. 9132 (AKH)

                                         :

                         Defendant.  :

------------------------------------------------------------- X

ALVIN K. HELLERSTEIN, U.S.D.J.:

Plaintiff Deborah Dedewo ("Plaintiff") brought this action for discriminatory discharge and failure to promote under the Civil Rights Act of 1866, 42 U.S.C. § 1981, the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. § 290 *et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.*, alleging that her employer Defendant CBS Corporation ("CBS" or "Defendant") engaged in unlawful discriminatory practices. In particular, Plaintiff alleges that Defendant engaged in race- and gender-based discrimination because other white male employees were not disciplined or terminated after being late or lying about their lateness. She also alleges that her termination was retaliation for reporting such discrimination to Defendant's internal complaint system.[1] Defendant moves for summary judgment on all counts, *see* ECF No. 100, denying that it discriminated against her in any way, and that her termination was brought on by her own dishonesty and insubordination.

---

[1] Plaintiff's Complaint included an additional count for failure to promote, but Plaintiff has withdrawn this count. *See* Plaintiff's Opposition to Motion for Summary Judgment ("Opp."), at 1 n.1, ECF No. 108.

I hold that there are no material issues of fact to be tried, and, for the reasons described below, I grant the motion and give judgment to Defendant.

### BACKGROUND

Plaintiff is an African American woman who began her employment with Defendant in mid-2012 as a freelance Ingest Operator in CBS Sports Networks' Media Asset Management Group ("MAM"). Defendant's Rule 56.1 Statement of Undisputed Facts ("SUF") ¶ 1, ECF No. 101.[2] One month later, Defendant also hired Edward Coleman ("Coleman"), who served as Plaintiff's department manager throughout the time they were both employed by Defendant and was responsible for all promotion recommendations. ¶ 2.

By all accounts, Plaintiff's tenure at CBS started off well. At Coleman's recommendation, Plaintiff received a salary increase on March 11, 2013. ¶ 5. In 2014, she applied for, and received, a full-time staff position, effective August 18, 2014, as Media Services Coordinator. ¶¶ 8–10. Coleman had encouraged Plaintiff to apply for the position, and he participated in the decision to offer her the position after she applied. ¶ 15. In fact, Coleman had begun working months earlier to get Plaintiff converted to a full-time staff employee, telling his boss, in April 2014, that Plaintiff's "performance ha[d] been excellent," and that "she'd be an ideal candidate for a conversion to staff employment." ¶ 16. At the end of 2014, Plaintiff received another positive review, resulting in a second salary increase on April 1, 2015, also at Coleman's recommendation. ¶ 5.

---

[2] Unless otherwise noted, paragraph symbols ("¶") refer to paragraphs in Defendants' Statement of Undisputed Facts, Dkt. No. 101, and corresponding paragraphs in Plaintiff's Opposition Statement ("Pl. SUF"), Dkt. No. 106. And unless otherwise noted, the stated facts are not disputed by the parties.

But things took a turn for the worse in 2015. Plaintiff's brother was set to compete in an international track meet in Europe in September 2015 that would allow him to qualify for the Olympics; wanting to be there, some time in Spring or Summer 2015, Plaintiff began planning a European vacation to attend the competition. ¶¶ 64–66; Dedewo Affidavit ¶ 27, ECF No. 106-1. By July 5, 2015, she began spending money in connection with the contemplated trip, including purchasing plane tickets sometime prior to August 12. ¶ 66. But Plaintiff did not have enough vacations days—she had used all but one by July 2015. ¶ 67. So on July 26, she asked Director of Payroll Evelyn Rivera ("Rivera") how to "put in time off (personal or vacation days) without any accruals." ¶ 67. Plaintiff told Rivera that she was "going to be overseas from 9/16-9/23," and that she would "email [her] boss" but "wondered how [to] enter" it into Defendant's time management system for approval. ¶ 68. Rivera told Plaintiff that she had one sick day remaining for the year, and that she could "submit an absence request" to her boss for that day, and for any unpaid days. ¶ 69.

On July 29, Plaintiff verbally requested an unpaid leave of absence from Coleman to go to Europe on vacation. ¶ 70. During the same conversation, Plaintiff also asked about returning to her prior freelance status, which would give her greater flexibility to take her trip. ¶ 71. Plaintiff adds that this was not the first time she inquired about returning to freelance status, and that she also had inquired in April 2015 because she was not making enough money and was looking for another part-time job. Pl. SUF ¶ 71. That same day, Plaintiff also emailed Nora McGoldrick ("McGoldrick"), who was responsible for coordinating the work schedules of MAM team members, that she had submitted a request for time off from September 16 to September 26 because she would be overseas. ¶¶ 72–73.

On August 6, Coleman followed up by email regarding Plaintiff's inquiry about returning to freelance status and informed her that she could opt to resign her full-time position. ¶ 74. However, he advised her that she would be forgoing benefits, paid time off, and guaranteed hours but, in any event, to let him know what she planned to do as soon as possible because the fall football season was rapidly approaching, and he needed to determine department responsibilities and schedules for the fall. ¶ 74. Plaintiff never responded because she decided not to pursue this option. ¶ 75.

On August 10, Plaintiff submitted a request in CBS's time management system for unpaid time off from September 16 to September 25; Coleman rejected the request the same day. ¶¶ 76–77. Plaintiff does not dispute these facts but notes that when she first spoke to Coleman in July, he did not verbally object at that time. Pl. SUF ¶ 77.

On August 11, Coleman followed up by email, confirming that he was unable to approve her request for unpaid time off in September, explaining that she had used all of her allocated vacation and personal time, and that he needed all staff personnel at work for the start of football season in September. ¶ 78. Again, Plaintiff does not dispute the contents of the email, but argues that MAM was always well staffed. Pl. SUF ¶ 78. Plaintiff responded to Coleman's email, telling him that she was under the impression that he "had no objections" to her request for time off "for the 5 unpaid days that [she would] be overseas which fares have already been purchased for." ¶ 79. This was the last communication Plaintiff had with Coleman about the denial of her request for time off. ¶ 80.

On August 18, by telephone and email, Plaintiff spoke with Vice President of Human Resources Bryn Berglund ("Berglund") about her leave request, and Berglund advised Plaintiff that the request had been denied, and she was expected to report to work. ¶¶ 81–82.

4

Thus, as of August 18, Plaintiff had been informed by Coleman and Berglund no fewer than three separate times that her request for unpaid leave was denied. ¶ 84. And by email on August 19, Plaintiff responded that she understood and that "arrangements [we]re being made in light of this decision." ¶ 85.

Although Plaintiff knew that taking a trip in September and missing work could have serious employment ramifications, Plaintiff decided to go to Europe anyway. ¶¶ 83, 86. Plaintiff was scheduled to work September 18 through September 22, 2015, and so she arranged to switch schedules with colleagues. ¶¶ 87–88. However, she was unable to switch on September 18, so she called out sick that day, texting a colleague and McGoldrick. ¶ 87, 91. Plaintiff was also scheduled to work the day shift on September 22, 2015, but as this was the day she was scheduled to return from Europe, she swapped for night shift that would begin at 6:00 p.m. ¶ 88. Plaintiff argues that McGoldrick approved the scheduling changes and also claims that she was suffering from myomas on September 18, and would have been unable to work anyway. Pl. SUF ¶¶ 86–88, 91.

On September 22, when Plaintiff was scheduled to begin working at 6:00 p.m., she arrived three hours late. ¶¶92–94. Although Plaintiff was "just coming through customs" at 5:00 p.m., she made no efforts to apprise her colleagues or supervisors of her delay. ¶ 93. McGoldrick texted her at 6:32 p.m., with a copy to Coleman, inquiring about her estimated time of arrival. ¶ 97. Plaintiff did not respond. ¶ 98. At 7:00 p.m., Coleman again texted her, "Are you coming in today?" ¶ 98. Eventually, at 8:12 p.m., Plaintiff responded, "Unfortunately still in transit." ¶ 99. Plaintiff told Coleman that she arrived some time between 9:00 and 9:30 p.m.; however, another colleague told Coleman that she did not arrive until 9:30. ¶¶ 100–01.

The following day, Coleman asked Plaintiff why she had been late. ¶ 104. Plaintiff first told him that she had "transit issues." ¶ 104. When pressed about having transit issues for three hours, Plaintiff told him she was hanging out with her brother in Queens and was "just late." ¶ 104. Coleman informed Plaintiff that she needed to come to work on time, and he memorialized his conversation with Plaintiff in an email to Berglund, stating that his "perception when speaking with [Plaintiff] is that she is not grasping" the concept that "coming to work on time is probably the most basic concept for any employee to understand in any industry." ¶ 106. Berglund responded that "not only is [Plaintiff's] tardiness . . . an issue, her lack of honesty is also an issue." ¶ 107.

On September 28, Coleman and Berglund met with Plaintiff and gave her the "Attendance Warning." ¶ 111. The warning summarized the events from September 22, including that Plaintiff first said she had "transit issues" and then that she was hanging out with her brother. ¶ 111. Coleman and Berglund emphasized that the attendance issue and lack of honesty were not tolerable, and that failure to improve her behavior immediately would lead to further disciplinary action, up to and including termination." ¶¶ 112–13. Plaintiff abruptly ended the meeting, stating that she was uncomfortable. ¶ 115. Plaintiff claims that she did not lie because she was in transit and complains that she was treated differently from other employees who came to work late. Pl. SUF ¶¶ 112, 115.

Immediately after receiving the Attendance Warning, Plaintiff contacted CBS's Executive Vice President and Chief Diversity Officer Josie Thomas ("Thomas") and then emailed a complaint to CBS's Open Line internal complaint system. ¶ 122. Plaintiff characterized the warning as "a misrepresentation," requested that it not be entered into her file,

and stated that she wanted "to file a complaint which involve[d] a lack of Equal Opportunity, Discrimination, and Harassment." ¶ 123.

Plaintiff's Open Line complaint was referred to CBS's Deputy Compliance Officer, Sonya Cheney ("Cheney"), for investigation. ¶ 125.  Plaintiff did not know Cheney, and had never met or spoken with her prior to submitting her complaint. ¶ 126.  Thereafter, Plaintiff had two conversations with Cheney.  In the first conversation on September 30, 2015, Plaintiff summarized the nature of her complaint. ¶ 129.  In the second conversation on October 1, 2015, Cheney asked Plaintiff if she had taken a trip to Europe after her request for unpaid leave was denied. ¶ 129.  Plaintiff initially denied having done so, but after Cheney "cautioned her that it was not a good idea to lie," Plaintiff admitted that she had gone on a "[m]odified trip or short trip, new trip," and that she had rearranged several shifts to take the "modified" trip. ¶¶ 129–30. Plaintiff also said that Cheney was "the only one who [knew] that [Plaintiff] went on the trip," and asked Cheney not to share this information with Coleman. ¶¶ 131.

That same day, Cheney relayed the foregoing information to Berglund, who was unaware that Plaintiff had taken a trip to Europe. ¶¶ 135–36.  Berglund then informed Coleman that Plaintiff had gone to Europe, and that she sought to keep this information from him. ¶ 137. Coleman and Berglund consulted with the Compliance Office, the CBS Law Department, and Human Resources executives, and terminated Plaintiff's employment on October 5, 2015. ¶ 139–40.

Plaintiff claims that her discharge was based on race- and gender-based discrimination because she was treated worse than two of her white male colleagues—Ross Wetoskey ("Wetoskey") and Robert Collins ("Collins")—who engaged in similar conduct.  First, Plaintiff avers that Ross Wetoskey was at least two and a half hours late for work on September

7, 2014, and was not disciplined for his lateness. Second, Plaintiff avers that Collins left work

two hours early to watch a hockey game on June 11, 2014, and claimed to be sick his first day

back from vacation on August 18, 2014 and August 17, 2015, but was never written up or issued

a verbal warning. Plaintiff also claims that her termination was retaliation for submitting a

complaint to Open Line.

On October 4, 2018, Plaintiff brought this suit under Section 1981 of the Civil

Rights Act of 1866, 42 U.S.C. § 1981; the NYSHRL, N.Y. Exec. L. § 290 *et seq.*, and the

NYCHRL, N.Y.C. Admin. Code § 8-101 *et seq.*, alleging that Defendant engaged in

discriminatory practices.

## DISCUSSION

### I.   Legal Standard

Summary judgment is appropriate when there is "no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a);

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists "if

the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must "view the evidence

in the light most favorable to the party opposing summary judgment[,] . . . draw all reasonable

inferences in favor of that party, and . . . eschew credibility assessments." *Amnesty Am. V. Town

of West Hartford*, 361 F.3d 113, 122 (2d Cir. 2004). However, the nonmovant may not rely on

conclusory allegations or unsubstantiated speculation to defeat the summary judgment motion.

*Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998).

"In assessing the inferences that may be drawn from the circumstances

surrounding a termination of employment, the court must be alert to the fact that [e]mployers are

8

rarely so cooperative as to include a notation in the personnel file that their actions are motivated by factors expressly forbidden by law." *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) (internal quotation marks omitted). "[C]aution must be exercised in granting summary judgment where intent is genuinely in issue . . . ." *Id.* at 40.  The Second Circuit has "repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where, as here, the merits turn on a dispute as to the employer's intent." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008).  "Even in the discrimination context, however, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Id.*

## II. Analysis

Plaintiff's claims under Section 1981 "are analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Simmons v. Akin Gump Strauss Hauer & Feld, LLP*, 508 Fed. App'x 10, 12 (2d Cir. 2013).  "Under the *McDonnell Douglas* framework, [Plaintiff is] required to make out a prima facie case of discrimination by showing: (1) membership in a protected class, (2) satisfactory job performance, (3) adverse employment action, and (4) circumstances giving rise to an inference of discrimination on the basis of her membership in that class." *Id.*  A Section 1981 plaintiff must also show that discriminatory intent was a "but-for" cause of her dismissal.  *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1014–15 (2020); *accord. Smalls v. Amazon.com Servs. LLC*, No. 20-CV-5492, 2022 WL 356432, at *3 (E.D.N.Y. Feb. 7, 2022); *Moleon v. Alston*, No. 21-CV-1398, 2021 WL 5772439, at *8 (S.D.N.Y. Dec. 3, 2021). "Although the burden of establishing a *prima facie* case is not onerous, and has been frequently described as minimal, the Second Circuit has also noted that a jury cannot infer discrimination

9

from thin air." *Workneh v. Pall Corp.*, 897 F. Supp. 2d 121, 130–31 (S.D.N.Y. 2012) (citation omitted).

Plaintiff's claim for retaliatory discharge[3] requires that (1) she was engaged in protected activity; (2) the defendant was aware of the protected activity; (3) she suffered a materially adverse action; and (4) there is a causal connection between her protected activity and the material adverse action. *See Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012). "[P]roof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000).

If a plaintiff establishes a prima facie case, a presumption of discrimination is created, and the burden of production shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment action or termination. *See McDonnell Douglas*, 411 U.S. at 802–03; *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005). "If the defendant bears its burden of production, the presumption drops out of the analysis and the defendant will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 98 (2d Cir. 2001) (internal citations and quotation marks omitted). To do so, Plaintiff must produce "not simply some evidence, but sufficient evidence to

---

[3] The Amended Complaint does not expressly include a count charging Defendant with retaliatory discharge, and as Defendant rightly notes in its reply, the only assertion in the entire Amended Complaint that remotely resembles an allegation of retaliation is that Plaintiff "was terminated under a pretext for unlawful employment discrimination and for complaining about unlawful employment discrimination." Amended Complaint ¶ 26, ECF No. 20. While I have the discretion not to consider this new theory of liability, raised for the first time in Plaintiff's opposition to summary judgment, *see Lyman v. CSX Transp., Inc.*, 364 Fed. App'x 699, 701 (2d Cir. 2010), I do so for the sake of completeness, and because Defendant has had an opportunity to respond in its reply.

support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false, and that more likely than not discrimination was the real reason" for the challenged actions. *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir.1996) (internal quotation marks omitted).

### A. Discriminatory Discharge

Plaintiff's evidence of pretext[4] is that she was treated less favorably than two of her white male colleagues. She claims that Wetoskey was two and a half hours late to work on one occasion but received no discipline. She also claims that Collins once left early to attend a hockey game, and twice called in sick his first day back from vacation. Collins likewise received no discipline. Plaintiff complains that only she was disciplined, and ultimately terminated, for being late. I hold that Plaintiff fails to raise an inference of discrimination.

A plaintiff may establish an inference of discrimination by establishing "that a similarly situated employee not in the relevant protected group received better treatment[.]" *Johnson v. Schmid*, 750 Fed. Appx. 12, 17 (2d Cir. 2018) (quoting *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53–54 (2d Cir. 2001)). Co-employees are similarly-situated they (1) are subject to the same performance evaluation and discipline standards and (2) engage in comparable conduct. *Abdul-Hakeem v. Parkinson*, 523 Fed. App'x 19, 21 (2d Cir. 2013) (citing *Ruiz v. County of Rockland*, 609 F.3d 486, 493–94 (2d Cir. 2010)). Conduct is comparable when it reflects equivalent culpability or seriousness and arises under facts and circumstances that bear a close resemblance. *See Ruiz*, 609 F.3d at 494.

---

[4] Plaintiff claims to have recorded at least ten (and maybe more than twenty) conversations with co-workers and supervisors at CBS, from which she argues that a discriminatory environment at CBS existed. However, she cannot rely on her account of those conversations because of persistent and willful discovery abuse and failure to produce any of the conversations. *See* Order, Apr. 12, 2021, ECF No. 70. She stated that she "lost" the recordings. *See id.* at 6–7, 9.

Plaintiff cannot raise an inference of discrimination by pointing to either Wetoskey or Collins. As to Wetoskey, Plaintiff claims that they were similarly situated because both she and he were at least 2 ½ hours late for work. Although the alleged misconduct bears facial similarity, Wetoskey is not a similarly situated comparator because the surrounding facts and circumstances were meaningfully different. To begin, Wetoskey let Coleman know in advance that he was going to be late, which allowed Coleman to get Wetoskey's shift covered— by Plaintiff. In contrast, Plaintiff made no such efforts even though she knew, or should have known, that she was going to be late (given that she entered customs at 5:00 p.m., only an hour before she was scheduled to work). Further, not only did Plaintiff fail to provide advance notice, she avoided contact with her supervisors to advise them of her lateness, ignoring McGoldrick's text entirely and waiting over an hour before responding to Coleman's text. In addition, there is nothing in the record suggesting that Wetoskey lied to Coleman about the reasons he was late. Plaintiff, in contrast, lied twice—once on the evening of September 22 when she told Coleman that she was "[u]nfortunately still in transit" and the next day when she told him first that she had "transit issues" and then that she was "hanging out" with her brother. Plaintiff's conduct was more serious than Wetoskey's, and therefore, Defendant's failure to treat them similarly does not raise an inference of discrimination. *See Ruiz*, 609 F.3d at 494.

As to Collins, Plaintiff claims that they were similarly situated because both called out sick. However, once again, Plaintiff fails to identify a similarly situated comparator in Collins because the facts and circumstances surrounding their alleged misconduct were meaningfully different. First, Collins purportedly twice called out sick, but he did so at the end of his vacation. Plaintiff, in contrast, called out sick to create an unauthorized vacation. Second, unlike Collins's absences, Plaintiff's were planned. After her request for unpaid time off was

denied, Plaintiff attempted to switch all her scheduled shifts. When she was unable to do so for

her September 18 shift, she had no option but to call out sick. She now claims that she was

suffering from myomas, and would not have come to work even if she had been in New York.

Even assuming this were true, it is irrelevant because it does not change the fact that, sick or not,

Plaintiff had no intention of reporting to work on September 18, nor could she have done so, if

she were well, because she was, in fact, in Europe. Plaintiff's conduct was comparatively more

serious and culpable than Collins's, and once again, Defendant's failure to treat them similarly

does not raise an inference of discrimination. *See id.*

In addition to Plaintiff's failure to identify any similarly-situated comparators,

there is nothing in the record that would allow a reasonable juror to conclude that racial animus

was more likely than not the real reason for her termination. The evidence of record shows

clearly that Plaintiff was fired because she defied her supervisors' orders, took an unauthorized

vacation when told she was needed at her job, and was willfully late in returning to her job.

Plaintiff was fired for cause, not because she was black (or female).

**B. Retaliatory Discharge**

Plaintiff's claims for retaliatory discharge also must be dismissed. Although the

burden to establish a prima facie case is admittedly low, Plaintiff has failed to establish the

necessary element of causation.

Plaintiff claims that she was terminated (the adverse employment action) a week

after she reported discriminatory treatment to Open Line (protected activity). She argues that her

termination was retaliation for her reporting of discrimination because Defendant only "changed

[her] warning into a termination" after she filed her complaint. Opp. at 17. Although temporal

proximity can, at times, give rise to an inference of proximal causation, no such inference is

13

warranted here because the basis for Plaintiff's termination pre-dated her Open Line complaint.

Defendant would have been within its rights to terminate Plaintiff before she engaged in

"protected activity." That Defendant did not do so until afterward does not render Defendant's

conduct retaliatory or discriminatory.

Plaintiff also fails to establish a causal connection because her own intervening

misconduct severs the chain of causation. Defendant was unaware that Plaintiff had lied about

going to Europe or the reason for her tardiness. It was only after Plaintiff filed her complaint

with Open Line, and Cheney pressed her on the matter, that the scope of Plaintiff's dishonesty

came to light. Worse, Plaintiff then asked Cheney not to tell Coleman about her trip or

dishonesty. It was this further and more egregious conduct that led Coleman and Berglund to

consult with the Compliance Office, the CBS Law Department, and Human Resources

executives, ultimately determining that they had no choice but to terminate Plaintiff. Plaintiff's

conduct after the fact, not retaliation, was the cause of her termination. *See Gubitosi v. Kapica*,

154 F.3d 30, 33 (2d Cir. 1998) (finding plaintiff's misconduct, in between her protected activity

and termination, constituted an intervening event that defeated an inference of retaliation). In

short, Plaintiff has not provided even circumstantial evidence establishing a "causal connection

between [Plaintiff's] protected activity and the material adverse action." *Lore*, 670 F.3d at 157.

Defendant is entitled to summary judgment as a matter of law on Plaintiff's

retaliatory discharge claim, as well as her claim of discrimination. I also decline to exercise

supplemental jurisdiction over her State- and City-law claims. *See* 28 U.S.C. § 1367(c)(3); *Klein*

*& Co. Futures v. Bd. of Trade*, 464 F.3d 255, 262 (2d Cir. 2006) ("It is well settled that where . .

. federal claims are eliminated in the early stages of litigation, courts should generally decline to

exercise pendent jurisdiction over remaining state law claims.").

## CONCLUSION

For the reasons described above, Defendant's motion for summary judgment is granted.  Oral argument is canceled.  The Clerk shall enter judgment in favor of Defendant with costs, terminate the motion (ECF No. 99), and mark the case closed.

SO ORDERED.

Dated:     April  5, 2022
           New York, New York

ALVIN K. HELLERSTEIN
United States District Judge